**CORRESPONDENT AGREEMENT FORM 200**

This Correspondent Loan Purchase Agreement ("Agreement"), dated the __10th__ day of __March__, 200_4_, by and between CitiMortgage, Inc. ("CMI"), for itself and on behalf of Citibank, FSB, Citibank (West), FSB, and Citibank, N.A., and;

_____Reunion Mortgage, Inc._____ ("Correspondent").

In consideration of the terms contained in this Agreement, CMI and Correspondent agree as follows:

1. **PURCHASE AND SALE OF MORTGAGE LOANS**

   From time to time, Correspondent may sell to CMI and CMI may purchase from Correspondent one or more residential mortgage, home equity or other loans ("Loan(s)") in accordance with the terms, conditions, requirements, procedures, representations and warranties set forth in the "CitiMortgage, Inc. Correspondent Manual" and all amendments, bulletins, program requirements and supplements to such Manual (collectively hereinafter referred to as the "CMI Manual"), and this Agreement. CMI and Correspondent agree that the CMI Manual is incorporated by reference herein and is part of this Agreement. Further, CMI and Correspondent agree that Citibank, FSB; Citibank (West), FSB; and Citibank, N.A. are intended third party beneficiaries of this Agreement.

   For each Loan offered for sale by Correspondent to CMI, Correspondent will deliver Loan documentation to CMI in accordance with the applicable terms, conditions, requirements, procedures, representations and warranties set forth in the CMI Manual. CMI may purchase Loans with or without conducting a complete review of the Loan documentation. CMI's review of, or failure to review, all or any portion of the Loan documentation shall not affect CMI's rights to demand repurchase of a Loan or any other CMI right or remedy provided by this Agreement.

   For each Loan CMI agrees to purchase, CMI shall pay the amount agreed upon by CMI and Correspondent ("Purchase Price") in accordance with the applicable provisions of the CMI Manual. CMI may offset against the Purchase Price any outstanding fees or other amounts owing from Correspondent to CMI in connection with the particular purchase or other transactions.

   As of the date CMI purchases each Loan, Correspondent will (i) transfer to CMI all of its right, title and interest in and to each Loan, including without limitation all documents held or subsequently acquired by Correspondent relating to each Loan and (ii) execute all documents necessary to transfer such right, title and interest to CMI.

2. **REPRESENTATIONS AND WARRANTIES**

   Correspondent represents, warrants and covenants throughout the term of this Agreement as follows:

   (a) That it is duly organized, validly existing, in good standing, qualified and authorized to do business in each jurisdiction where it originate Loans or where a property securing any of its Loans is located; that all corporate or other actions and approvals necessary for the execution and performance of this Agreement have been taken and/or received; and that no consent from any third party is required for the execution and performance of this Agreement.

   (b) That it (i) holds and shall maintain in good standing throughout the term of this Agreement all applicable license(s) and/or registration(s) in each jurisdiction that is/are necessary for Correspondent's Loan origination, purchase and sale activities under this Agreement and (ii) is in full compliance with all laws in each jurisdiction which govern Correspondent's activities under this Agreement. Correspondent agrees to promptly provide CMI with copies of all such license(s) and/or registration(s) upon request by CMI.

   (c) That it will allow CMI to periodically investigate the financial (including but not limited to obtaining corporate and/or individual credit reports) and other status of Correspondent and, if necessary, the financial and other status of Correspondent's directors, officers and/or employees. If necessary, Correspondent shall cooperate with CMI to obtain the written consent of one or more of Correspondent's directors, officers and/or employees to such periodic investigation. Correspondent agrees that the failure to obtain such consent may result in the termination of this Agreement in accordance with the provisions of Sec. 7.

EXHIBIT 1

CORRESPONDENT
AGREEMENT
FORM 200

(d) That it is thoroughly familiar with and will comply with all applicable federal (including but not limited to the Real Estate Settlement Procedures Act, Truth-In-Lending Act, Equal Credit Opportunity Act and federal fair lending laws), state and, if necessary, local laws and regulations directly or indirectly relating to its activities under this Agreement (including but not limited to involvement in such activities of individuals convicted of crimes involving dishonesty or breach of trust).

(e) That Correspondent is an approved seller/servicer of conventional residential adjustable and fixed-rate mortgage Loans for Fannie Mae, Freddie Mac, and/or is a FHA-, VA- and/or HUD-approved mortgagee ; that Correspondent is duly qualified, licensed, registered and otherwise authorized under all applicable laws and regulations and is in good standing to (i) originate, sell, endorse and assign Loans and, if applicable, the related Loan collateral to CMI, (ii) service Loans in the jurisdiction(s) where, if applicable, the properties securing such Loans are located for Fannie Mae, Freddie Mac, FHA or VA, and (iii) no event has occurred that would make Correspondent unable to comply with Fannie Mae, Freddie Mac, FHA, VA or HUD eligibility requirements or that would require notification to Fannie Mae, Freddie Mac, FHA or VA or HUD.

(f) That it does not believe, nor does it have any reason or cause to believe, it cannot perform every covenant contained in this Agreement or continue to carry on its business substantially as now conducted; that it is solvent and the sale of Loans will not cause it to become insolvent; that no action, suit, proceeding or investigation pending or threatened against Correspondent, either alone or in the aggregate, may result in its inability to carry on its business substantially as now conducted; and that the sale of Loans under this Agreement is not undertaken with the intent to hinder, delay or defraud any of its creditors.

(g) That it has obtained and reviewed or will, upon execution of this Agreement, promptly obtain and review the CMI Manual and will fully comply with its terms, conditions, requirements and procedures.

(h) That it does not currently and will not in the future employ any entity or individual on the Freddie Mac exclusionary list.

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading. The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

(j) That the documentation for each Loan sold to CMI (i) shall be duly executed by the borrower(s), (ii) shall create a valid and legally binding obligation of the borrowers(s) and (iii), if applicable, shall create a fully enforceable first or subordinate lien on the property securing repayment of the Loan.

(k) That each mortgage, home equity or other Loan (i) shall be fully enforceable and originated in accordance with the terms, conditions, representations, warranties and covenants contained in the CMI Manual and this Agreement which were in effect as of the Loan closing date, (ii), if applicable, was serviced in accordance with applicable Fannie Mae, Freddie Mac, FHA, VA and/or HUD requirements and industry standards, and (iii) is subject to no defects or defenses, including but not limited to damage to the property securing the Loan, lien imperfections or environmental risk.

(l) That any third-party originators referring, or in any way involved with, any Loan shall be, at a minimum, approved by Correspondent according to Fannie Mae, Freddie Mac, FHA, VA and/or HUD guidelines for approving third-party originators as described in the CMI Manual.

(m) That it will immediately notify CMI if it (i) fails to maintain any license or registration in violation of Sec. 2(b) above and/or (ii) becomes subject to any enforcement and/or investigative

CORRESPONDENT
AGREEMENT
FORM 200

proceeding by any licensing or regulatory authority or agency and/or (iii) is named as a party or becomes involved in any material litigation.

(n) That it will immediately notify CMI if (i) Correspondent and/or any of its principal director(s) or owner(s) becomes the debtor in any voluntary or involuntary bankruptcy proceeding, (ii) Correspondent and/or any of its principal director(s) or owner(s) requests the appointment of a receiver and/or (iii) Correspondent and/or any of its principal director(s) or owner(s) has incurred or is likely to incur a material, adverse change in its/their financial condition.

(o) That it will immediately notify CMI of any material change in ownership and/or management.

(p) That it will promptly respond to or otherwise comply with CMI's reasonable request(s) for periodic financial statements of Correspondent and/or any of its principal director(s) or owners and any other documentation required by CMI in connection with the recertification of Correspondent.

(q) That it will fully comply with all additional representations, warranties and covenants contained in the CMI Manual.

(r) That all representations, warranties and covenants contained in this Agreement and the CMI Manual shall survive the expiration and termination of this Agreement.

3. COSTS

Correspondent shall pay all costs and expenses incurred in connection with the transfer and delivery of Loans to CMI purchased pursuant to this Agreement, including but not limited to mortgage Loan assignment preparation and recording fees, fees for title policy endorsements and continuations, and Correspondent's attorneys' fees.

4. CORRESPONDENT ADVERTISING; NON-SOLICITATION AND CUSTOMER PRIVACY

Correspondent may advertise to the public the availability of various Loan programs, but Correspondent may not, in any way, directly or indirectly identify CMI in all such advertising unless (i) required by applicable law or (ii) CMI has, in advance, approved use of CMI's name in such advertising.

Correspondent agrees that the borrower(s) on all Loans shall, at the time of purchase by CMI, become the exclusive customers of CMI for all Loan-related purposes. During the first twelve (12) months after the date any Loan is purchased by CMI, Correspondent represents and warrants that Correspondent, Correspondent's directors, officers, employees, agents or affiliates will not, without the prior consent of CMI, (i) use targeted advertising, solicit or otherwise directly encourage or incent the Loan borrower(s) to refinance or prepay the Loan that was purchased by CMI, (ii) prepare, sell or distribute any customer list incorporating the names, addresses or any non-public personal information of such borrower(s) or (iii) use any such customer list to solicit, promote, or allow any other entity to solicit or promote, the sale of financial services or products to any such borrower(s). CMI and Correspondent agree that nothing contained herein shall prohibit advertising or solicitation by Correspondent that is directed to the general public in the area where the Loan borrower(s) reside(s).

Correspondent acknowledges that it has received a copy of the Citigroup Privacy Promise and/or Citigroup Privacy Policy and, to the extent necessary, shall comply with all applicable provisions of such Promise and/or Policy. Correspondent also agrees that it shall comply with all applicable federal or state laws related to the use and/or retention of the non-public personal and/or financial information associated with all Loans and the related Loan borrower(s).

5. TERM

This Agreement is for an initial one-year term and shall automatically renew for successive one-year terms, unless terminated pursuant to Section 7 of this Agreement.

CORRESPONDENT
AGREEMENT
FORM 200

6. **RELATIONSHIP BETWEEN CMI AND CORRESPONDENT**

   This Agreement will not create any agency between Correspondent and CMI. Correspondent shall conduct its business under this Agreement as an independent contractor and shall have the rights and responsibilities of an independent contractor.

   CMI shall not be responsible for any actions or omissions by Correspondent. Correspondent agrees it will not represent, orally, in writing, by implication or otherwise, that it can act in any capacity on behalf of CMI.

   CMI is prescribing no marketing plan for Correspondent and exercises no control over the methods, operations and practices of Correspondent except as provided in this Agreement and the CMI Manual.

   Correspondent acknowledges it is not selling or distributing CMI's services, and CMI has made no promise, representation or warranty regarding the profitability of any arrangement with Correspondent.

   Correspondent and CMI acknowledge that each will be providing the other party with valuable proprietary information ("Confidential Information"), including but not limited to information regarding CMI's or Correspondent's products, programs, underwriting policies, procedures and customers. Except as necessary to perform its obligations under this Agreement or as required by law, each party will not disclose any Confidential Information to any person outside that party's organization and will limit access to this information within its organization on a strict "need to know" basis. Each party agrees to notify all of its directors, officers, employees and other agents of its obligations regarding Confidential Information and will cause such directors, officers, employees and other agents to comply with such obligations.

7. **TERMINATION**

   CMI may immediately terminate this Agreement without notice and CMI then will have no further obligations under this Agreement upon: (1) the failure of Correspondent to perform or abide by any term, condition, covenant or obligation contained in this Agreement or the CMI Manual; (2) the finding by CMI that any representation or warranty made by Correspondent is false or incorrect in any material respect; (3) commencement by or against Correspondent of any bankruptcy, insolvency or similar proceedings; (4) CMI's determination that Correspondent's actions contravene the terms and conditions of this Agreement or could adversely impact CMI's activities or reputation; or (5) the failure of loans sold by Correspondent to CMI pursuant to this Agreement to satisfy CMI's expectations regarding loan quality and/or performance.

   Either party may terminate this Agreement for any other reason upon thirty (30) calendar days prior notice to the other. In the event of termination, Correspondent shall fully cooperate with and assist CMI in obtaining the documentation necessary to complete the processing and full resolution of all matters (including but not limited to the delivery of all application and/or closed loan documents and, if applicable, all Loan Insuring documentation) relating to all Loans purchased by CMI.

8. **ASSIGNMENT**

   Correspondent may not assign this Agreement or any of its responsibilities under this Agreement. CMI reserves the right, upon notice to Correspondent, to assign or delegate in whole or in part its obligations and responsibilities under this Agreement to any affiliated entity engaged in the business of residential financing.

9. **NON-EXCLUSIVE AGREEMENT**

   Correspondent's rights under this Agreement are on a non-exclusive basis. CMI shall be free to market its products and services to, and to contract with, other parties and customers as it deems appropriate.

CORRESPONDENT
AGREEMENT
FORM 200

10. INDEMNIFICATION

Correspondent agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) Correspondent's performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual (including but not limited to Correspondent's failure to timely deliver all documents and records associated with or related to all Loans purchased by CMI pursuant to this Agreement), (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant contained this Agreement or the CMI Manual and/or (iii) Correspondent's advertisements, promotions or other activities. This indemnification shall extend to any action or inaction by the directors, officers, employees, agents, independent contractors or other representatives of Correspondent and shall survive the expiration and termination of this Agreement.

11. CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

    (i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

    (ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loan;

    (iii) was or is capable of being rescinded by the applicable borrower(s) pursuant to the provisions of any applicable federal (including but not limited to the Truth-In-Lending Act) or state law or regulation;

    (iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

    (v) was subject to an Early Payment Default (as defined in the CMI Manual), an Early Payoff (as defined in the CMI Manual) or any other payment related defect (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

CORRESPONDENT
AGREEMENT·
FORM 200

12. GOVERNING LAW; VENUE

This Agreement shall be governed by the laws of the State of Missouri and applicable federal law.

CMI and Correspondent agree that any action, suit or proceeding to enforce or defend any right or obligation under this Agreement or otherwise arising out of either party's performance under this Agreement shall be brought in St. Louis County Circuit Court or the United States District Court for the Eastern District of Missouri and each party irrevocably submits to the jurisdiction of either forum, and waives the defense of an inconvenient forum to the maintenance of any such action, suit or proceeding in such state or federal court and any other substantive or procedural rights or remedies it may have with respect to the maintenance of any such action or proceeding in either forum.

13. NOTICE

All notices to CMI shall be sent in accordance with the applicable provisions of the CMI Manual and shall be addressed according to such provisions.

Prior to or at the time Correspondent executes this Agreement, it shall provide CMI with one or more procedures and addresses for delivering notices pursuant to this Agreement. In addition to these procedures and addresses, Correspondent agrees and acknowledges that CMI may deliver all notices required by this Agreement in writing to Correspondent at the address listed on the last page of this Agreement.

14. MODIFICATION; MERGER; ENTIRE AGREEMENT; NO WAIVER OF RIGHTS

This Agreement may not be modified except by a document or record signed by both CMI and Correspondent. This Agreement (including the CMI Manual) contains the entire agreement of the parties and supersedes all previous agreements (including all amendments thereto) between the parties hereto. Any representations, promises or agreements not contained in this Agreement or the CMI Manual shall have no force or effect. The failure of either party to exercise any right given to it under this Agreement or to insist on strict compliance of any obligation under this Agreement shall not constitute a waiver of any right, including the right to insist on strict compliance in the future.

15. ON-SITE REVIEW AND DOCUMENT COLLECTION

Correspondent shall permit any officer, employee or designated representative of CMI, at any reasonable time during regular business hours and upon reasonable advance notice by CMI, to conduct an examination and audit on Correspondent's premises of any of the processes implemented and documents kept by Correspondent regarding any Loan purchased by CMI pursuant to this Agreement. If Correspondent fails to timely deliver, in accordance with the applicable terms and conditions specified in the CMI Manual, all documents and records associated with or related to any Loan purchased by CMI pursuant to this Agreement, Correspondent shall also give CMI and its officers, employees, or designated representatives reasonable access to Correspondent's premises in order to allow CMI to retrieve, prepare or otherwise obtain all such documents and records. Correspondent shall also make its officers, employees and/or designated representatives available to CMI and shall cooperate with CMI in all such examinations, audits and document and record collection activities.

16. AUTHORITY TO EXECUTE AGREEMENT

Correspondent represents and warrants that it has all requisite power, authority and capacity to enter into this Agreement and to perform all obligations required of it hereunder. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action(s). Correspondent shall, upon request by CMI, execute such supplemental resolutions, acknowledgments and/or certifications as may be reasonably necessary to evidence such power, authority and capacity.

CORRESPONDENT
AGREEMENT
FORM 200

### 17. CORRESPONDENT GRANT OF LIMITED POWER OF ATTORNEY

Correspondent hereby appoints CMI and the directors, officers, employees, agents, successors and assigns of CMI as its true and lawful attorney-in-fact without right of revocation and with full power of substitution for and in its place and stead to (I) demand and control all sums due on Loans purchased pursuant to this Agreement and to enforce all rights with respect thereto, (ii) endorse, mark, place or otherwise evidence Correspondent's name as payee on all checks, drafts, acceptances or other form of partial or full Loan payment delivered or tendered to CMI, (iii) endorse, mark, place or otherwise evidence Correspondent's name on all notes, mortgages, deeds of trust, and other forms of security instruments or collateral and all assignments, full or partial releases or satisfactions of said mortgages, deeds of trust, and other forms of security instruments or collateral for all Loans purchased pursuant to this Agreement. Correspondent agrees to execute such other documents as CMI may reasonably request to evidence the appointment of CMI as Correspondent's attorney-in-fact.

### 18. MISCELLANEOUS

All capitalized terms not otherwise defined herein shall have the meanings attributed to them in the CMI Manual. All Section headings are for convenience only and shall not be construed as part of this Agreement. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction and, to accomplish this purpose, the provisions hereof are severable. **This Agreement shall not be effective until signed by both parties.**

IN WITNESS WHEREOF, the duly authorized officers of CMI and Correspondent have executed this Agreement as of the date first above written..

| CITIMORTGAGE, INC. | Reunion Mortgage, Inc. |
|---|---|
| (CMI) | (CORRESPONDENT) |
| By _[signature]_ | By _[signature]_ |
|  | R. Kent Harvey |
| Title VICE PRESIDENT | Title Senior Vice President |
| Date 3/16/04 | Date 03/10/2004 |

RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage, Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
-0151/GEID ████ 3401

Correspondent Notice Address:
860 Hillview Court, Suite 300
Milpitas, CA 95035

**NOTE: THE TEXT OF THIS AGREEMENT MAY NOT BE CHANGED IN ANY MANNER WITHOUT THE EXPRESS PERMISSION OF CITIMORTGAGE, INC.**

data/word/citicor.doc (12/12/03)

33414

7 of 7

(12/03)

## Delegated Underwriting Addendum

This Delegated Underwriting Addendum ("Delegated U/W Addendum"), effective as of ___March 10th___, 20_04_ supplements and amends the CitiMortgage, Inc. ("CMI") Correspondent Loan Purchase Agreement (the "Agreement") dated ___March 18th___, 20_02_ by and between CMI and ___Reunion Mortgage, Inc.___, ("Correspondent")

WHEREAS, CMI and Correspondent, pursuant to Section 14 of the Agreement, desire to make certain changes to the Agreement in connection with the delegation of certain underwriting functions to Correspondent,

WHEREAS, Citibank, FSB; Citibank (West), FSB; and Citibank, NA (collectively referred to herein as "The Banks") may, from time to time, purchase from CMI certain Loans which are covered by the provisions of this Delegated U/W Addendum, and the parties hereby expressly acknowledge that The Banks are intended third party beneficiaries of the Agreement and this Addendum, and

WHEREAS, Correspondent desires to originate Loans which comply, in all material respects, with the appropriate underwriting criteria established by CMI for the associated Loan product.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other good and valuable consideration, CMI and Correspondent agree as follows:

1) The following paragraphs are added to Section 11 ("Cure or Repurchase") of the Agreement:

Correspondent expressly agrees that it shall underwrite each Loan in conformity with the applicable underwriting criteria of CMI. If an audit by CMI on any Loan reveals that it was underwritten in violation of the applicable CMI underwriting criteria, Correspondent will, not later than thirty (30) days after receipt of written notice from CMI, repurchase the Loan at the Repurchase Price or provide CMI with written evidence as to why Correspondent believes such underwriting criteria was not violated. If, after reviewing Correspondent's written evidence, CMI, in its sole and independent discretion, determines the Loan was not originated in accordance with the applicable underwriting criteria, Correspondent will, not later than thirty (30) days after receiving further written notice from CMI, repurchase the Loan at the Repurchase Price specified in the Agreement, Manual and/or applicable Bulletin(s).

Correspondent expressly agrees and acknowledges that all Loans that become 60 days or more delinquent during the first six months after origination ("Early Default Loans") will be fully audited by CMI. Should such an audit reveal that one or more Early Default Loans do not, in the sole and independent discretion of CMI, conform to the applicable CMI underwriting criteria, Correspondent will, not later than thirty (30) days after receipt of written notice from CMI, repurchase all such Early Default Loans at the Repurchase Price.

33414

Correspondent expressly agrees and acknowledges that CMI (i) is entitled to independently exercise and/or receive all benefits and remedies of the Agreement, Manual, and this Delegated U/W Addendum with respect to all Loans purchased by CMI and (ii) may, in its sole and independent discretion, terminate the Correspondent's delegated underwriting privileges with respect to all or a specified number of Loan products at any time upon ten (10) days advance written notice to Correspondent of such full or partial termination.

2) Except as amended herein, all other terms and conditions of the Agreement (including but not limited to the remaining provisions of Section 11) shall remain in full force and effect.

3) Capitalized terms not defined in this Delegated U/W Addendum shall have the meanings attributed to them in the Agreement.

4) This Delegated U/W Addendum supersedes and replaces all other delegated underwriting Addendum(s) previously executed by Correspondent and CMI.

IN WITNESS WHEREOF, the duly authorized officers of Correspondent and CMI have executed this Delegated U/W Addendum.

Reunion Mortgage, Inc. ("Correspondent")

By: _R. Kent Harvey_ (signature)

Name: R. Kent Harvey

Title: Senior Vice President

CitiMortgage, Inc. ("CMI")

By: (signature)

Name: R MCCOPPIN

Title: Vice President

RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage, Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
-0151/GEID ████3401

3/16

delegatedunderwriting (1/26/04)

33414



# CitiMortgage, Inc.
## *Correspondent Lending*

## BULK PURCHASE AMENDMENT

This Bulk Purchase Amendment ("Amendment") effective as of January 25, 2006 by and between Reunion Mortgage Inc. (hereinafter "Seller") and CitiMortgage, Inc. (hereinafter "Buyer").

WHEREAS, Seller and Buyer have entered into a Correspondent Agreement (hereinafter the "Agreement") dated March 10, 2004 ; and

WHEREAS, Buyer and Seller wish to amend the Agreement to buy and sell Loans in accordance with the Agreement, this Amendment, and the Buyer's Correspondent Manual (hereinafter "Manual") and agree this Amendment shall supercede the Manual only as to items specifically addressed herein.

NOW THEREFORE, in consideration of the mutual promises, covenants, representations and warranties herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

I. **BULK PURCHASE PROGRAM**

   Seller has been approved to sell and deliver Loans under Buyer's Bulk Purchase Program. Buyer and Seller have agreed to the following terms and conditions regarding Seller's participation in Buyer's Bulk Purchase Program.

   A. Buyer may purchase and Seller may sell pools of Loans on a bulk basis from time to time, pursuant to the terms of the Agreement, the Manual and this Amendment.

   B. With respect to each pool of Loans as to which Buyer has made a successful bid ("trade execution"), a Commitment Letter, substantially in the form of Exhibit 1 (the "Commitment") will be prepared by the Buyer and delivered to the Seller within three (3) Business Days of trade execution. Seller must review the Commitment and must contact Buyer within two (2) business days of Buyer's transmission of the Commitment and either execute the Commitment or further negotiate terms.

   C. No later than 11:00 a.m. Central Time on the Delivery Date specified on the Commitment, Seller shall make the complete Loan file, the contents of which are defined in Exhibit 5 ("Contents of Each Mortgage File") for each Loan in the pool to be purchased available for review by Buyer (or Buyer's designee) at Buyer's office or other location agreed upon by Buyer and Seller. At Buyer's option, Buyer (or Buyer's designee) shall review any or all such Loan files to determine whether the corresponding Loan(s) are acceptable for purchase by Buyer. Whether or not Buyer chooses to review the Loan files before or after the Closing Date or agrees to purchase a Loan that Seller proposes to include in a Loan pool after review shall have no effect on the representations and warranties given by Seller with respect to each Loan in the pool or Buyer's right to demand repurchase or other relief as provided in the Agreement, the Manual or this Amendment. Promptly after any review, Buyer will inform Seller of any Loans that are not acceptable for purchase. Buyer shall have the option of allowing the Seller to cure the deficiency (ies) or may allow Seller to substitute one or more Loans subject to Buyer's approval.

D. Seller agrees that delivery of Loans acceptable to Buyer for purchase pursuant to a given Commitment is mandatory. Furthermore, Seller acknowledges its obligation to deliver Loans acceptable for purchase by Buyer in an aggregate principal amount at least equal to the amount, and within the time specified in the Commitment. To the extent Seller fails to deliver acceptable Loans in conformance with the requirements of the Commitment, Seller must pay Buyer a Pair Off amount as calculated below. The Pair Off amount is equal to (a) the difference between the interpolated dollar price of current coupon FNMA Securities in effect on the Commitment date and the date of the Pair Off, including any mutually agreed upon non-conforming spread tightening as determined by the Buyer and Seller, multiplied by (b) any deficiency of the aggregate principal amount delivered pursuant to the applicable Commitment. If there is no loss due to spread or price differential, Buyer will not assess a Pair Off fee.

E. On the Closing Date as defined in the Commitment, Buyer shall purchase the Loans that are acceptable for purchase as determined by Buyer (subject to the pre- or post-purchase review provisions of Section C above). The Purchase Price shall be calculated as set forth in the Commitment. If Seller substitutes Loans prior to the Closing Date, Buyer may adjust the aggregate Purchase Price to reflect substitute Loans. Buyer shall prepare and forward a mutually agreeable Term Sheet to Seller, in a form substantially similar to Exhibit 2 ("Term Sheet"), prior to the Closing Date reflecting the terms of the funding schedule.

F. In the event the Transfer date is on the Closing Date, the Loans shall be transferred in accordance with Exhibit 3 ("Loan Transfer Procedures").

G. In the event the Loans will be interim serviced for Buyer, Seller shall service the Loans in accordance with Exhibit 4 ("Interim Servicing"), and shall transfer the Loans at the Transfer Date as defined in and in accordance with Section F, above.

H. The parties agree that all terms and conditions negotiated for each pool of loans purchased on a bulk basis pursuant to this Amendment shall be kept confidential and shall not be released or revealed to any third party without the prior express written consent of the other party.

I. Seller represents and warrants that the Loans were originated by the Seller or by a savings and loan association, a savings bank, a commercial bank or similar banking institution which is supervised and examined by a federal or state authority, or by a mortgagee approved as such by the Secretary of HUD.

J. Seller represents and warrants that none of the Loans are classified as (a) "high cost" loans under the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), or (b) "high cost," "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws, and no Loan is in violation of any state law or ordinance similar to HOEPA; and

K. Seller represents and warrants that it has complied with all applicable anti-money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable borrower and the origin of the assets used by the said borrower to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable borrower for purposes of the Anti-Money Laundering Laws.

Revised 04/25/05

2 of 3

L. Seller has completed the attached Exhibit 6 ("Seller's Authorized Employees") and represents and warrants that the employees of Seller identified therein are authorized to sign all necessary documents and negotiate the terms of the transactions contemplated pursuant to this Amendment. Further, Seller represents and warrants that it will promptly notify Buyer of any changes, additions or deletions of names from Exhibit 6. Under no circumstances shall Seller assert that a sale of Loans under this agreement is invalid for any reason on account of it having been negotiated and consummated by an unauthorized employee of Seller.

Except as modified by this Amendment, all terms, conditions, representations and warranties of the Agreement, Manual, and any previously executed Amendments shall remain in full force and effect. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement, Manual or, if appropriate, other executed Amendment(s).

IN WITNESS WHEREOF, Buyer and Seller have executed this Bulk Purchase Amendment by their duly authorized officers as of the date first written above.

| Reunion Mortgage, Inc. ("Correspondent") | CitiMortgage, Inc. |
|---|---|
| By: [signature] | By: [signature]   JON W. GERRETSEN National Production Director Correspondent Lending/CitiMortgage 1000 Technology Drive/MS 800 O'Fallon, MO 63304 |
| Name: R. Kent Harvey | Name: Jon W. Gerretsen |
| Title: Senior Vice-President | Title: National Production Director, Correspondent Lending |

Cc: Richard McCoppin, Intermediary Management

Revised 04/25/05

### EARLY PURCHASE PROGRAM AMENDMENT

This Early Purchase Program Amendment ("Amendment") is entered into this 29th day of <u>NOV</u>, 20<u>04</u> by and between <u>REUNION MORTGAGE, INC</u> (hereinafter "Seller") and CitiMortgage, Inc. (hereinafter "Buyer").

WHEREAS, Seller and Buyer have entered into a Correspondent Agreement (hereinafter the "Agreement") dated <u>March 10, 2004</u>; and

WHEREAS, Buyer and Seller wish to amend the Agreement to buy and sell Eligible Loans (as defined below) in accordance with the Agreement, this Amendment, and the Buyer's Correspondent Manual (hereinafter "Manual") and agree this Amendment shall supercede the Manual only as to items specifically addressed herein.

NOW THEREFORE, in consideration of the mutual promises, covenants, representations and warranties herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer agree as follows:

Seller has been approved to sell and deliver Loans under Buyer's Early Purchase Program. Buyer and Seller have agreed to the following terms and conditions regarding Seller's participation in Buyer's Early Purchase Program:

1. Definitions

    a. Eligible Loans: all Loan products and types offered by Buyer for which the Seller performs the underwriting as defined in the Manual. Eligible Loans are sold servicing released to Buyer.
    b. Early Purchase Program: Buyer's offering of a delivery execution from approved Sellers utilizing Eligible Warehouse Lenders whereby the Purchase Price, as defined in the Manual, is paid in two parts, the first upon satisfactory delivery of the Early Purchase Program Collateral File and the second upon satisfactory conclusion of the Interim Period.
    c. Early Purchase Program Collateral File: Means that file to be delivered to the Eligible Warehouse Lender prior to the payment of the Initial Purchase Price and containing:
        i. The Buyer's registration confirmation
        ii. The original note with appropriate endorsement(s)
        iii. Certified true copy of original security instrument
        iv. A completed Exhibit A, as defined and attached to this Amendment;
        v. Such other documentation as may reasonably be required by Buyer and Eligible Warehouse Lender.

    d. Eligible Warehouse Lender: means First Collateral Services, Inc.

73414

e. Adjusted Purchase Price: Purchase Price for an Eligible Loan, as defined in the Manual, less the amount paid to Seller in the form of the Initial Purchase Price;
f. Initial Purchase Price: The amount advanced by an Eligible Warehouse Lender for any Eligible Loan for interim financing, not to exceed the note amount of the Eligible Loan,
g. Interim Period: the time period between payment of the Initial Purchase Price and the payment of the Adjusted Purchase Price
h. Warehouse Line of Credit: Seller's account with an Eligible Warehouse Lender which provides interim financing for the purchase or origination of Loans.

2. <u>Procedures for purchase of Eligible Loans</u>

Seller shall register Eligible Loans with Buyer as provided in the Manual and Agreement and identify the Eligible Loan as being delivered pursuant to the Early Purchase Program utilizing the form attached hereto as Exhibit A and delivering the same to the Eligible Warehouse Lender, with a copy to Buyer. Seller shall deliver to Eligible Warehouse Lender the Early Purchase Program Collateral File. Upon notification to Buyer by the Eligible Warehouse Lender that the Early Purchase Program Collateral File has been received and is acceptable for purchase, Buyer shall purchase the Eligible Loan by payment to the Seller's Eligible Warehouse Lender of the Initial Purchase Price, which amount shall be credited to the Seller's Warehouse Line of Credit. Seller shall receive notice of such purchase in the form of Exhibit B, upon payment of the Initial Purchase Price by Buyer, and evidence that all title and interest in the Eligible Loan shall and has been transferred to Buyer on that date. The sale of Eligible Loans shall be servicing released and Seller shall service Eligible Loans during the Interim Period on behalf of Buyer. Following payment of the Initial Purchase Price, Seller shall deliver all Loan documents required under the Agreement and Manual to Seller within 15 days or prior to the expiration of the Rate Lock period as defined in the Buyer's Commitment, whichever is earlier. Upon a determination by Buyer in its sole discretion that the Loan documents are acceptable and meet all requirements for Loans sold to Buyer under the Agreement, Manual and this Amendment, Buyer shall remit the Adjusted Purchase Price to Seller's Eligible Warehouse Lender and transmit a Purchase Advice to Seller. Buyer's review or failure to review the Loan documents under this section shall not affect Seller's repurchase obligations under the Agreement, Manual or this Amendment.

3. <u>Seller to Service Eligible Loans during the Interim Period</u>

During the Interim Period, Seller shall service Eligible Loans in accordance with Exhibit C and all applicable federal, state and local law, regulations and ordinances. Seller shall promptly notify Buyer if any Eligible Loan becomes delinquent in payment or a borrower defaults in any way under the terms of the Eligible Loan. Seller shall release custody of its servicing file for any Eligible Loan only in

accordance with the written instructions of Buyer. Seller shall allow Buyer upon reasonable notice and during regular business hours to review and copy the contents of the servicing file for the Eligible Loans. Seller shall be paid an amount equal to the note rate of the Eligible Loan calculated on the outstanding principal balance on the Eligible Loan during the Interim Period from which sum Seller shall pay to the Eligible Warehouse Lender the Service Fee as specified in the agreement between Seller and the Eligible Warehouse Lender, retaining the difference as a servicing fee for servicing that Eligible Loan

4. Transfer of Servicing

Upon payment of the Adjusted Purchase Price, Seller shall transfer the servicing of the Eligible Loan in accordance with the Manual. Seller shall deliver notices to the borrower as required by applicable law in a form acceptable to Buyer.

5. Seller's Duties pursuant to the Agreement and Manual

Except as otherwise described in this Amendment, Seller shall comply with all delivery requirements in the Agreement and Manual, including the timely submission of all Loan documents required to verify compliance with Buyer's loan program guidelines and to enable Buyer to board the Loan to its servicing system.

6. Repurchase

If for any reason after payment of the Initial Purchase Price but before the conclusion of the Interim Period, a Loan is found to be defective or ineligible for purchase by Buyer pursuant to the Agreement, Manual or this Amendment, Buyer shall provide Seller with notice of the defect and Seller shall immediately repurchase said Loan by payment within 10 days to Seller of an amount equal to the Initial Purchase Price. Upon receipt of the repurchase amount, Buyer shall return, or cause to be returned to Seller or its designee all documents for the Loan previously received by or on behalf of Buyer. After the Interim Period, Seller shall have such repurchase obligations for the Loan(s) as are provided in the Agreement and Manual.

7. Seller's Additional Representations and Warranties

In addition to the representations and warranties made by Seller to Buyer in the Agreement and Manual, Seller further represents and warrants as follows:

    a. that for each Loan delivered under the Early Purchase Program, the terms, conditions and qualifications of the Loan(s) meet the requirements as found in the Agreement and Manual, the applicable provisions of which are incorporated by reference into this Amendment;

    b. that the Loans were originated by the Seller or by a savings and loan association, a savings bank, a commercial bank or similar banking

       institution which is supervised and examined by a federal or state authority, or by a mortgagee approved as such by the Secretary of HUD;

c. that none of the Loans are classified as (a) "high cost" loans under the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), or (b) "high cost," "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws, and no Loan is in violation of any state law or ordinance similar to HOEPA;

d. that it has complied with all applicable anti- money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable borrower and the origin of the assets used by the said borrower to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable borrower for purposes of the Anti-Money Laundering Laws;

8. Termination

Any expiration or termination of the Agreement shall automatically terminate this Amendment. This Amendment, and Seller's participation in the Early Purchase Program, may be terminated at any time by Buyer upon 10 days written notice to Seller. Buyer may terminate this Amendment immediately upon breach of any provision of the Agreement, Manual or this Amendment. Buyer reserves the right to terminate the Early Purchase Program immediately in the event it is informed or information comes to its attention that it is or may be in violation of any law, ordinance or code, or if it is so determined by any court, tribunal or other authority. Termination under this provision shall not affect Eligible Loans which have been identified as Loans to be delivered under the Early Purchase Program and for which an Initial Purchase Price has been paid, except for circumstances in which the Early Purchase Program is terminated for reasons described in the preceding sentence, in which case the parties shall in good faith arrive at a mutually agreeable resolution affecting the purposes of the Agreement and the Manual in purchasing such Loans.

9. Amendments

Buyer reserves the right to amend or modify the terms and conditions of this Amendment upon thirty (30) days written notice to Seller.

10. **Preservation of Rights and Remedies Under the Agreement and Manual**
Except as modified by this Amendment, all terms, conditions, representations and warranties of the Agreement, Manual, and any previously executed Amendments shall remain in full force and effect. Capitalized terms not otherwise defined herein shall have the meanings set forth in the Agreement, Manual or, if appropriate, other executed Amendment(s).

IN WITNESS WHEREOF, Buyer and Seller have executed this Early Purchase Program Amendment by their duly authorized officers as of the date first written above.

CitiMortgage, Inc.
(Buyer)
By: _____
Title: VICE PRESIDENT

REUNION MORTGAGE, INC.
(Seller)
By: _____
R. KENT HARVEY
Title: SENIOR VICE PRESIDENT

RICHARD P. McCOPPIN
Manager Eligibility & Wholesale MIS
CitiMortgage, Inc.
1000 Technology Drive/MS 111
O'Fallon, MO 63304
███-0151/GEIO #███3401