UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CITIMORTGAGE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.   4:10CV1632 RWS |
| | ) | |
| REUNION MORTGAGE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

CitiMortgage, Inc. is in the business of purchasing, reselling, and servicing residential mortgage loans.  Reunion Mortgage, Inc. is engaged in the business of originating, sourcing and/or reselling residential mortgage loans.  CitiMortgage and Reunion entered into a contract whereby CitiMortgage could purchase mortgage loans originated by Reunion.  Under the contract Reunion is obligated to cure or repurchase any loans that contain defects such as material misrepresentations.  CitiMortgage has demanded that Reunion cure or repurchase twenty-six loans that are materially defective.  Reunion declined to do so. Citimortgage filed this lawsuit asserting a claim for breach of contract against Reunion.  CitiMortgage has moved for summary judgment on its claim.  Because it is undisputed that Reunion breached the contract, I will grant CitiMortgage's motion for summary judgment.

*Background*

CitiMortgage purchases mortgages that have been originated by approved lenders, including lenders known as "correspondents," under its Loan Purchasing Program (the Program).  Through the Program, CitiMortgage functions as an investor in the secondary mortgage market.  CitiMortgage in turn resells some of the loans it purchases to the Federal

National Mortgage Association (a/k/a Fannie Mac), the Federal Home Loan Mortgage

Corporation (a/k/a Freddie Mac), and to other investors in the secondary mortgage market.

     CitiMortgage uses a standard contract with loan originators and correspondents to

purchase residential mortgage loans.  The contract is entitled "Correspondent Agreement Form

200."  Reunion entered into a Correspondent Agreement Form 200 with CitiMortgage on March

10, 2004.  In addition, Reunion and CitiMortgage entered into a Delegated Underwriting

Addendum on March 10, 2004, a Bulk Purchase Amendment dated January 25, 2006, and an

Early Purchase Program Amendment on November 29, 2004.  These contracts will collectively

be referred to as "the Agreement" between CitiMortgage and Reunion.

     Under the Agreement, Reunion must deliver certain loan documentation to CitiMortgage

for each loan sold to CitiMortgage.  The Agreement gives CitiMortgage the right to require

Reunion to repurchase any loan that CitiMortgage, in its sole and exclusive discretion,

determines is defective because it was underwritten or originated or based on materially

inaccurate information or material misrepresentation, and / or in violation of the terms of the

Agreement and applicable underwriting guidelines, and / or must be repurchased from Fannie

Mac, Freddie Mac, or other secondary market investor.  When CitiMortgage is required to

repurchase a loan from an investor it will make the investor whole by paying the repurchase

price requested by the investor and assuming the investor's rights in the loan.

     CitiMortgage's right to require Reunion to repurchase such defective loan is found in

Section 11 of Form 200 which provides:

     If CMI, in its sole and exclusive discretion, determines any Loan
purchased pursuant to this Agreement:

     (i) was underwritten and/or originated in violation of any term, condition,

requirement or procedure of this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

    (ii) was underwritten and/or originated based on materially inaccurate information or material misrepresentation made by the Loan borrower(s), [Reunion], [Reunion's] directors, officers, employees, agents, independent contractors and/or affiliates or any other party providing information relating to said Loan;
...
    (iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by [Reunion] of any representation, warranty or covenant contained in this Agreement of the CMI Manual or a failure by [Reunion] to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; ....

[Reunion] will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI.  If, after receiving such notice from CMI, [Reunion] is unable to correct or cure such defect within the prescribed time, [Reunion] shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price"), or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate.  If CMI requests a repurchase of a defective Loan, [Reunion] shall, within ten (10) business days of [Reunion's] receipt of such repurchase request, pay to CMI the Repurchase Price...  If such defective Loan is owned by CMI at the time of the repurchase by [Reunion], CMI shall ... execute and deliver such instruments of transfer or assignment ... as shall be necessary to vest in [Reunion] or its designee title to the repurchased loan.

(Doc. # 64, CitiMortgage's Statement of Uncontroverted Facts in Supp. of Summ  J., Ex. B at

¶11).

In addition, Section 10 of the Agreement included an indemnification provision in the

event Reunion breached the Agreement:

[Reunion] agrees to indemnify and hold CMI harmless from any and all claims, actions and costs, including reasonable attorneys' fees and costs, arising from (i) [Reunion's] performance or failure to perform under the terms, conditions or obligations of this Agreement or the CMI Manual... (ii) any fraud, misrepresentation or breach of any representation, warranty or covenant

contained [in] this Agreement or the CMI Manual...

(Id. at ¶10).

*The loans at issue*

Since 2004, CitiMortgage purchased over 13,000 mortgages from Reunion under the Agreement. Twenty-six (26) of those loans are at issue in this lawsuit. Those loans are identified by the parties as the: Acevedo Loan # XXXXXX8621; Avila Loan # XXXXXX4130; Bates Loan # XXXXXX9657; Camba Loan # XXXXXX7467; Cassidy Loan # XXXXXX9656; Du Loan # XXXXXX4191; Gurrola Loan # XXXXXX1500; Hernandez Loan # XXXXXX6323; Herrera Loan # XXXXXX0851; Macias Loan # XXXXXX7007; McCulloch Loan # XXXXXX9007; McGrautha Loan # XXXXXX9221; Ng Loan # XXXXXX9005; Nguyen Loan # XXXXXX8402; Oliva Loan # XXXXXX1301; Pascua Loan # XXXXXX4547; Perguson Loan # XXXXXX1243; Pickert Loan # XXXXXX1144; Ramos Loan # XXXXXX0915; Roman Loan # XXXXXX6628; Sanchez Loan # XXXXXX8406; Sanchez Loan # XXXXXX8845; Singh Loan # XXXXXX1465; Tafoya Loan # XXXXXX7250; Valdez Loan XXXXXX8405; and Young Loan # XXXXXX1697.

After purchasing these loans from Reunion, CitiMortgage discovered that the application packages for these loans were materially inaccurate or contained material misrepresentations or that the loans were otherwise defective. The sale of these loans was governed by the Agreement.

Under the Agreement, CitiMortgage is granted sole discretion to determine whether a loan was underwritten and/or originated in violation of any condition of the Agreement (and its incorporated documents). The Agreement gives CitiMortgage the discretion to demand that Reunion cure any defect in a loan. If the defect is not cured, CitiMortgage may require Reunion

-4-

to repurchase the loan.

CitiMortgage has demanded that Reunion cure the defects in these loans or repurchase them.  Reunion has declined to do so.  Reunion does not dispute that CitiMortgage, in its sole discretion, has found that the loans are materially defective under the Agreement.  Instead, Reunion asserts that it followed CitiMortgage's underwriting guidelines was not aware of any defects at the time it sold the loans to CitiMortgage.

CitiMortgage filed this case asserting a breach of contract claim against Reunion for failing to comply with the demand to indemnify CitiMortgage for all losses associated with these loans and/or for failing to repurchase the loans.  CitiMortgage seeks damages in the amount of the "Repurchase Price" for these loans as that price is calculated in the Agreement.  Under section 2301(the glossary) of the CitiMortgage Manual, the Repurchase Price is defined as:

> [T]he sum of (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan; (iv) any price paid in excess of par by CitiMortgage on the funding date; and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Id., Ex. C).  CitiMortgage calculates the total Repurchase Price of the twenty-six loans at issue is $4,007,191.47.  (Id. at p 24).  CitiMortgage has moved for summary judgment in this amount on its claim for breach of contract against Reunion.

### Legal Standard

Summary judgment is appropriate if the evidence, viewed in the light most favorable to

the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998)(citing Fed. R. Civ. P. 56(c)).  The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof.  Id. at 324.  In resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy.  Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

*Discussion*

Under Missouri law, the elements for a breach of contract are: "(1) the existence of an enforceable contract between the parties to the action; (2) mutual obligations have arisen under the contract terms; (3) defendant has not performed its obligations imposed by the contract; and (4) plaintiff was thereby damaged." Superior Insurance Com. v. Universal Underwriters Insurance Company, 62 S.W.3d 110 (Mo. Ct. App. 2001).  In the present case, the parties entered into the Agreement, which provided for mutual obligations.  CitiMortgage has asserted that it has made a demand under the Agreement for Reunion to perform its obligation to repurchase the loans at issue, Reunion has declined to repurchase the loan, and, as a result, that CMI has been damaged.

-6-

Reunion admits that defects were found in each of the loans.  (Doc. # 70, Reunion's Mem. in Opp'n at pp. 23-33).  Likewise, Reunion admits that CitiMortgage determined that the loans were defective pursuant to one or more subsections of Section 11.  (Doc. # 71, Reunion's Resp. to CitiMortgage's Statement of Uncontroverted Facts ¶¶ 49 - 108).[1]  Section 11 of the Agreement provides that CitiMortgage, upon determining in its own discretion that the loans are defective, may demand cure or repurchase of the loans.  As a result, Reunion's failure to repurchase the loans after requested to do so by CitiMortgage constitutes a breach of contract.

I find that CitiMortgage has proven all of the elements of its breach of contract claim. CitiMortgage found, in its exclusive discretion, that there were defects in the loans. CitiMortgage asked Reunion to repurchase the loans.  Reunion has refused that demand which has cause CitiMortgage to be damaged.  CitiMortgage, therefore, is entitled to summary judgment unless there is an affirmative or absolute defense that would preclude entry in CitiMortgage's favor as a matter of law.

Reunion has not produced any evidence that challenges CitiMortgage's determination that these loans contain material misrepresentations, misstatements or other material defects as defined in the Agreement.  Instead, Reunion asserts that the Agreement contains ambiguities which negates its obligation to repurchase the loans.  Reunion also argues that it originated the loans in accord with CitiMortgage's underwriting guidelines and was not aware of any material misrepresentations or defects at the time it sold the loans to CitiMortgage.  Reunion argues that

---

[1] In response to these sections of CitiMorgage's Statement of Uncontested Facts, Reunion claims it followed CitiMortgage's underwriting guidelines and had no reason to know of the loan defects, but Reunion does not dispute that CitiMortgage determined that the loans were defective.

it is unfair to require it to repurchase loans in which material defects were found after CitiMortgage performed further reviews of the loan.  It is undisputed, however, that Reunion entered into the Agreement with CitiMortgage which gave CitiMorgage the right to demand that Reunion cure or repurchase any loans that CitiMortgage found, in its sole and exclusive discretion, were materially defective.

*Ambiguity*

Reunion asserts that its duty to repurchase the loans under the Agreement is unenforceable because the Agreement contains an ambiguity.  Reunion argues that Sections 2(i), 10, and 11 of the Correspondent Agreement Form 200 creates such an ambiguity.

This identical argument was made by Reunion's counsel in another case in this District. In CitiMortgage v. Allied Mortgage Group. Inc, 4:10CV1863 JAR (Slip Opin. E.D. Mo., October  24, 2012) CitiMortgage filed a breach of contract claim against Allied for Allied's refusal to repurchase defective loans.  CitiMortgage and Allied entered the identical Agreement at issue in this case.  The same attorneys who represent the parties in this case represented the parties in the Allied case.  Reunion's Memorandum in Opposition to CitiMortgage's Motion for Summary Judgement makes the identical arguments that Reunion's counsel asserted as counsel in the Allied case.  United States District Judge John A. Ross granted CitiMortgage's motion for summary judgment in the Allied case in a memorandum opinion entered on October 24, 2012. Judge Ross's opinion thoroughly analyzed Allied's defenses in the Allied case (the identical defenses asserted in this case by Reunion).[2]

---

[2] As counsel of record in the Allied case, both parties' counsel in this litigation have a copy of Judge Ross' opinion.  CitiMortgage filed a copy of the opinion in this case and Reunion filed a supplemental memorandum regarding the opinion.

Judge Ross rejected Allied's claim that the Agreement contained the ambiguity that Allied's counsel reasserts in this case on behalf of Reunion.  Judge Ross's opinion stated the following:

### 1.    Ambiguity

The Just Mortgage [CitiMortgage v. Just Mortgage, Inc., 4:09CV1909

DDN (E.D. Mo)] court outlined when a contract will be considered ambiguous:

A contract is ambiguous where reasonable people could fairly and honestly differ in the reading of the terms because the terms are susceptible of more than one interpretation. Yerington v. La-Z-Boy, Inc., 124 S.W.3d 517, 520 (Mo. Ct. App. 2004); accord Kastendieck v. Millers Mut. Ins. Co., 946 S.W.2d 35, 39 (Mo. Ct. App. 1997) ("An ambiguity exists where there is duplicity, uncertainty or indistinctness in the meaning of the words used."). In addition, "if language which appears plain considered alone conflicts with other language in the contract, or if giving effect to it would render other parts of the contract a nullity, then [the court should] find the contract to be ambiguous." Zeiser v. Tajkarimi, 184 S.W.3d 128, 133 (Mo. Ct. App. 2006). Similarly, "language which promises something in one point and takes it away in another is ambiguous." Kastendieck, 946 S.W.2d at 39. In construing a contract, the court should "attribut[e] a reasonable meaning to each phrase and clause, and harmoniz[e] all provisions of the agreement" rather than "leave[] some of the provisions without function or sense." Teets v. Am. Fam. Mut. Ins. Co., 272 S.W.3d 455, 467 (Mo. Ct. App. 2008) (citation omitted). Whether or not a contract is ambiguous is a question of law for the court to decide. Id. at 462.

Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *35-36.

Allied again argues that Sections 2(i), 10 and 11 of the Agreement are patently ambiguous.  (Response, pp. 5-13).[3]  Allied asserts that allowing CMI to

---

[3]The Court previously addressed the ambiguity argument in its Order on Allied's Motion to Compel Disclosure (ECF No. 39).  In its Order, the Court ruled that "no ambiguity exists between §2(I) and §11(ii).  (ECF No. 51, p. 8).  The Court stands by this determination. CitiMortgage, Inc. v. Allied Mortg. Group, Inc., No. 4:10CV01863, 2012 U.S. Dist. LEXIS

treat Section 11 of the Agreement as a "strict liability" provision would render

Section 2(i) and Section 10 of the Agreement completely meaningless.

(Response, p. 5).

Section 2 of the Agreement, labeled "Representations and Warranties"

provides:

> Correspondent represents warrants and covenants throughout the term of
>
> this Agreement as follows:
>
> ***
>
> (i) That neither this Agreement nor any statement, report or other
> information provided or to be provided pursuant to this Agreement
> (including but not limited to the statements and information contained in
> the documentation for each loan purchased by CMI) contains or will
> contain any misrepresentation or untrue statement of facts or omits or will
> omit to state a fact necessary to make the information not misleading.
> **The provisions of this sub-section shall not apply** to information
> obtained from (i) appraisers, escrow agents, title companies, closers,
> credit reporting agencies or any other entity approved from CMI
> ("Approved Entity") **unless Correspondent knows or has reason to
> believe that any information provided by such Approved Entity is not
> true, correct or valid in any material respect and** (ii) the Loan
> applicant(s) **unless Correspondent knows, has reason to believe or,
> after performing its normal due diligence and quality control review,
> should have known that any information provided by the Loan
> applicant(s) is not true, correct or valid in any material respect.**

(Response, p. 7)(emphasis in Response).  Allied contends that the safe harbor

provision in Section 2 conflicts with the purported strict liability provision in

_____

60790, at *10-12 (E.D. Mo. May 1, 2012)

Section 11.  (Id., pp. 7-8).  Allied maintains that CMI improperly attempts to limit Section 2(i) to Section 10 of the Agreement and assume that Section 11 is immune from the knowledge provision of Section 2(i).  Allied asserts that this is an incongruous distinction because Sections 10 and 11 of the Agreement are the same in terms of the triggering events and the relief afforded under them.  (Id., p. 8).  Allied claims that both provisions are triggered by "the existence of material misrepresentations resulting in one or more defects in a loan sold to CMI" under the Agreement.  (Id.).  Allied argues that whether the relief available under Sections 10 and 11 of the Agreement is termed repurchase (Section 11) or indemnification (Section 10) "is solely a semantic difference--the result is the same, and thus Allied's liability under those substantially identical provisions should be the same."  (Id., p. 9).

Allied also suggests that there are ambiguities between Sections 2202 and 248 of the CMI Manual and Section 11 of the Agreement. Allied claims these sections, along with Sections 2(i) and 10 of the Agreement, vary "simply" and "radically" regarding what standard will be applied in determining the requirements under which it will be obligated to repurchase and/or indemnify losses for loans Allied sold to CMI.  (Id., p. 10).  Section 2202 of the CMI Manual, called "REPRESENTATIONS AND WARRANTIES," contains a subheading, "Fraud and Misrepresentation," which provides:

> As of the date the Loan was originated, *except as qualified in section 2(i)* of the Correspondent Loan Purchase Agreement, the Correspondent represents and warrants that all information relating to the Loan was complete and accurate, and contained no fraud or misrepresentation,

whether the information was obtained, derived or requested by a third party or an affiliate of the Correspondent or otherwise, or by the Correspondent.

(Response, p. 9)(emphasis in Response).  Allied argues that this section qualifies Allied's liability to only those loans with defects it knew of or should have known of; Allied claims this qualification supports the conclusion that Sections 2(i), 10 and 11 of the Agreement, as well as Section 2202 of the CMI Manual are ambiguous.  (Id., p. 10).

Likewise, Allied notes that, under Section 248,  it was precluded from verifying income on Stated Income products.  Section 248 of the CMI Manual, called "PROGRAM DESCRIPTIONS," contains a subheading, "Asset Based Stated Income Program."  (Id.).  This section provides, "If income is documented in loan file, the loan is no longer eligible for a stated income or no income program." (Id.).  Allied claims that its inability to verify borrowers' incomes and assets cuts in its favor because it should not be held liable for misrepresentations which it could not have verified or otherwise prevented.  (Id.).  Allied contends that barring it from verifying borrower statements of income further supports the conclusion that Sections 2(i), 10 and 11 of the Agreement and Sections 248 and 2202 of the CMI Manual are reasonably susceptible of more than on construction. (Id.).

Several Courts have addressed the ambiguity issue and found no ambiguity between §2(i) and §11.  As this Court previously recognized, there is no ambiguity or conflict between these sections:

-12-

>Section 2(i) and § 2202 are representation and warranty sections, the terms of which are limited to each  subsection. Section 2(i) and § 2202 are breached when a correspondent knows or should have known that loan documents contain misstatements, misrepresentations, or omissions but nonetheless submits the defective documents to CitiMortgage. Section 11(ii) sets forth one set of circumstances in which CitiMortgage can demand a correspondent cure or repurchase a loan, specifically, upon CitiMortgage determining that the loan was underwritten or originated based on a misstatement, misrepresentation, or omission. Section 11(ii) is breached when a correspondent fails to cure or repurchase the loan, and applies regardless of the correspondent's knowledge.
>
>That § 2(i) and § 2202 are limited to those instances where the correspondent knows or should have known of the misstatement, misrepresentation, or omission does not conflict or create an ambiguity when read with § 11(ii). ...

Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *38-39.

The Court also finds Allied's argument that Section 10 creates an ambiguity with respect to Section 11(ii) to be unpersuasive because these Sections do not have the same triggering events or remedy provisions.  First, Section 10 only becomes operable when there is a breach of the Agreement. Section 10 is a general indemnification provision, which is applicable to breaches of the Agreement, including breaches of any representations or warranties such as those set out in Sections 2(i) and 2202.  In contrast, Section 11 allows CMI to demand cure or repurchase when there has been a misrepresentation, even absent of any breach.  See Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *38 ("Section 11(ii) is breached when a correspondent fails to cure or repurchase the loan, and applies regardless of the correspondent's knowledge.").  Second, "[t]he

-13-

remedies available for breach of § 2(i) also differ from those available for a breach of § 11(ii). Remedies for a breach of § 2(i) are set forth in § 10, while the available remedies for a breach of § 11(ii) are [CMI's] ability to demand that the correspondent cure or repurchase the defective loan and any other such remedies as [CMI] deems appropriate." Just Mortgage, 2012 U.S. Dist. LEXIS 43522, at *30. Likewise, Section 11 provides that CMI's rights under Section 11 do not affect any indemnification obligations Allied has under Section 10 for breach of the Agreement independent of Section 11. See Reply, p. 15.

Based upon the above reasoning and as discussed by this Court previously, the Court finds that Allied has not demonstrated that §§ 2(i), 10, 11(ii), 2202, and 248 when read together, are ambiguous and conflicting.[4] Accordingly, Allied has not proven the defense of ambiguity. See Scenic Holding, LLC v. New Bd. of Trs. of the Tabernacle Missionary Baptist Church, Inc., 506 F.3d 656, 670 (8th Cir. 2007)("The burden of proving a defense of an affirmative nature is upon the defendant.")(citation omitted); Midwest Oilseeds, Inc. v. Limagrain Genetics Corp., 387 F.3d 705, 714 (8th Cir. 2004)("The specificity requirement of Rule 56 applies with equal force where the defendant opposes summary judgment, especially where the defendant resists by asserting

---

[4]Similarly, the Court finds no basis for finding that Section 248 makes the Agreement ambiguous. As discussed herein, Allied had the option not to utilize CMI's Stated Income products, and instead use products that allowed Allied to verify the borrowers' income and assets. Therefore, Allied's argument that it should not be held liable for misrepresentations which it could not have verified or otherwise prevented is unfounded. Allied could have verified this information, and not have been subject to the strict liability provisions, if it had utilized one of CMI's non-Stated Income products.

-14-

affirmative defenses which it has a burden to prove."); <u>Herd v. Am. Sec. Ins. Co.</u>, 501 F. Supp. 2d 1240, 1245 (W.D. Mo. 2007)(burden of proof for establishing an affirmative defense is on the defendant).

<u>Allied</u>, 4:10CV1863 at 8-12.

As stated above, Judge Ross was analyzing the identical ambiguity argument asserted in the <u>Allied</u> case which Reunion, represented by the same counsel which represented Allied, asserts in the present case. I agree with Judge Ross' well reasoned analysis there is no ambiguity in the Agreement as asserted by Reunion.

Moreover, Reunion's remaining defenses in this matter are the identical defenses Reunion's counsel raised in an identical brief submitted in the <u>Allied</u> case in the identical contract dispute with CitiMortgage.

Judge Ross addressed the those defenses in <u>Allied</u> as follows:

**2.    Good Faith and Fair Dealing**

Allied argues that CMI abused the "sole and exclusive" discretion afforded it under the Agreement, thereby breaching the implied covenant of good faith and fair dealing. (Response, pp. 13-14). Allied also asserts that CMI exercised bad faith by creating and developing "defective" loan guidelines for a Stated Income Loan product that CMI knew "showed a marked propensity towards default." (<u>Id</u>., p. 13).

Allied, however, fails to address relevant case law that found no bad faith by CMI under similar circumstances. As noted by the OCM court, "to establish a breach of the covenant of good faith and fair dealing, there must be evidence that

the party with the discretion exercised its discretion in such a way so as to evade the spirit of the transaction or deny the other party the expected benefit of the contract." OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *10. As previously discussed, Allied does not dispute that there were defects in the Loans. Instead, Allied simply argues that, despite these defects, CMI would be acting in bad faith to demand the repurchase of the Loans because CMI knew of the high default rate of Stated Income products.

The Court finds that "[t]here can be no bad faith if [CMI] simply performed the actions expressly granted it by the parties' agreement, including determining that loans were defective and needed to be repurchased." OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *11. It is undisputed that CMI acted in accordance with the provisions of the Agreement and the unfettered discretion afforded to CMI therein. Likewise, CMI's purported knowledge "concerning market conditions and the efficacy of its guidelines does not implicate whether it exercised its discretion to demand cure or repurchase of the ... Loans in good faith." Just Mortg., Inc., 2012 U.S. Dist. LEXIS 43522, at *45. In sum, Allied has not shown that CMI "exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny [Allied] the expected benefit of the contract." CitiMortgage, Inc. v. First Cal. Mortg. Co., No. 4:10 CV 1498 RWS, 2011 U.S. Dist. LEXIS 154568, at *5 (E.D. Mo. Nov. 29, 2011). Accordingly, the Court finds that Allied has failed to meet its burden of proof on the defense that CMI acted in bad faith in its

-16-

performance of the Agreement.

3.      **Unconscionability/Adhesion**

Allied raises the defenses of unconscionability and adhesion.  These

defenses are related, but distinct defenses.  See Surman v. Merrill Lynch, Pierce,

Fenner & Smith, 733 F.2d 59, 61 (8th Cir. 1984)(noting that a court may deny

giving effect to an "unconscionable" clause in a standardized contract of

adhesion); International Harvester Credit Corp. v. Leaders, 818 F.2d 655, 659

(8th Cir. 1987)(a contract of adhesion is not automatically unconscionable, but

rather must be examined in light of several factors).  The Courts in this district

have discussed the elements for what constitutes an unconscionable contract or

provision or a contract of adhesion:

> Under Missouri law, an unconscionable ...  provision in a
> contract will not be enforced. State ex rel. Vincent v. Schneider,
> 194 S.W.3d 853, 856-61 (Mo. 2006) (invalidating as
> unconscionable arbitration clauses requiring the consumer to pay
> for all arbitration fees and allowing an entity related to one of the
> parties to select the arbitrator). There are procedural and
> substantive aspects to unconscionability. Procedural
> unconscionability  relates to the formalities of the making of an
> agreement and encompasses, for instance, fine print clauses, high
> pressure sales tactics or unequal bargaining positions; substantive
> unconscionability refers to undue harshness in the contract terms.
> Cicle v. Chase Bank USA, 583 F.3d 549, 554 (8th Cir. 2009);
> Whitney v. Alltel Comm's, Inc., 173 S.W.3d 300, 308-14 (Mo.
> Ct. App. 2005); Fay v. New Cingular, Wireless, PCS, LLC, No.
> 4:10CV883 HEA, 2010 U.S. Dist. LEXIS 124831, 2010 WL
> 4905698, at *2 (E.D. Mo. Nov. 24, 2010). "Generally there must
> be both procedural and also substantive unconscionability before a
> contract or clause can be voided." Whitney, 173 S.W.3d at 308;
> see also Kan. City Urology, P.A. v. United Healthcare Servs., 261
> S.W.3d 7, 15 (Mo. Ct. App. 2008) (reversing the trial court's
> finding that arbitration clause was void where the trial court found
> only substantive unconscionability and not procedural

unconscionability).

Kenner v. Career Educ. Corp., No. 4:11CV00997, 2011 U.S. Dist. LEXIS

136484, at *8-9 (E.D. Mo. Nov. 29, 2011).

> A contract of adhesion, as opposed to a negotiated contract, is a form contract that is created and imposed by the party with greater bargaining power. Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 697 (Mo. banc. 1982). The "stronger party" has more bargaining power than the "weaker party," often because the weaker party is unable to look elsewhere for more attractive contracts. Id. The contract is offered on a "take this or nothing" basis. State ex rel. Vincent v. Schneider, 194 S.W.3d 853, 857 (Mo. banc. 2006).  The terms in the contract are imposed on the weaker party and "unexpectedly or unconscionably limit the obligations and liability of the [stronger party]." Robin v. Blue Cross Hospital Service, Inc., 637 S.W.2d 695, 697 (Mo. banc. 1982).

Finnie v. H&R Block Fin. Advisors, Inc., No. 07-429-CV-W-NKL, 2007 U.S.

Dist. LEXIS 74472, at *7-8 (W.D. Mo. Oct. 4, 2007)

Allied argues that the Agreement is substantively and procedurally

unconscionable.  (Response, pp. 14-18).  Allied contends that it is procedurally

unconscionable because of Allied's lack of knowledge and lack of voluntariness

in entering into the Agreement.  (Id., pp. 16-18).  Allied argues that Section 11

essentially turns the Agreement into an insurance policy for CMI whereby Allied

must indemnify and insure against any and every defect in the loans it sold CMI,

regardless of whether it was aware of the defect.  (Id., p. 15).  Allied argues that it

did not have knowledge that the "safe harbor," afforded by Section 2(i), would be

rendered meaningless by the unilateral imposition of a strict liability

interpretation of Section 11.  (Id., p. 17).  Allied notes that the CMI Manual consists of thousands of pages and asserts that CMI essentially drowned Allied in a "flood of paperwork" that it knew "would not and could not be read in time for the signing of the contract."  (Id.).  Allied also argues that the Agreement was not voluntary because Allied had to accept it "as is" even though the Agreement is patently one-sided.  (Id.).  In addition, Allied contends that the Agreement is substantively unconscionable due to the harsh contract terms.  (Id., p. 18).  Basically, Allied argues that it was allocated all of the risk of the loans, without affording Allied any benefit for the assumption of that risk.  (Id.).

Similar to its argument that the Agreement was unconscionable, Allied argues that the Court should not enforce the Agreement because it was a contract of adhesion.  (Id., pp. 18-19).  Allied asserts that if it had known that the standardized provisions, particularly Section 11, would have been interpreted as "an insurance policy, whereby it was obligated to forever indemnify CMI for any defect existing with regards to the Subject Loans, regardless of whether Allied could have even known of such defects" then it would not have entered into the Agreement.  (Id.).  Accordingly, Allied argues that the Court should not enforce the Agreement.

In the instant case, the Court finds that the affirmative defenses of unconscionability and adhesion are not available to Allied because it, like CMI, is a sophisticated business entity.  There is no gross disparity between the parties.  Allied and CMI are both well versed in reviewing and negotiating contract

language. The Court finds that both parties were fully capable of negotiating or altering the contract language to effect any change desired.  Moreover, the Court does not believe that the Agreement is so "one-sided" that it could be considered unconscionable or a contract of adhesion.  Allied clearly benefitted from their Agreement.  During the course of their Agreement, Allied sold CMI over 2,560 loans, constituting over three hundred and sixteen million dollars worth of business.  (Reply, p. 24).  Thus, Allied's affirmative defenses of unconscionability and adhesion fail.

    **4.**        **In Pari Delicto, Unclean Hands, and Laches**

     In its Answer, Allied raises the equitable defenses of in pari delicto, unclean hands and laches.  "Pari delicto is Latin for 'equal fault.' The in pari delicto doctrine is the principle that a plaintiff who participated in wrongdoing may not recover damages based on the wrongdoing."  In re Senior Cottages of Am., LLC, 482 F.3d 997, 999, n.3 (8th Cir. 2007).  Likewise, the doctrine of unclean hands is a defense that bars one who has acted wrongfully with respect to the subject of the suit from obtaining an equitable remedy.  Sangamon Assocs., Ltd. v. Carpenter 1985 Family P'ship, Ltd., 165 S.W.3d 141, 145 (Mo. 2005)(citing Karpierz v. Easley, 68 S.W.3d 565, 572 (Mo. App. 2002)).  Finally, "[l]aches may be used to bar a lawsuit when the plaintiff is guilty of (1) unreasonable and unexcused delay, (2) resulting in prejudice to the defendant."  Whitfield v. Anheuser-Busch, Inc., 820 F.2d 243, 244 (8th Cir. 1987)(citing Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 804 (8th Cir. 1979)).

-20-

In its Memorandum, CMI argues that these defenses are "not available as a matter of law because CMI is not seeking an equitable remedy." (Memorandum, p. 24). In response, Allied claims that it is entitled to the affirmative defenses of in pari delicto (defense no. 12), unclean hands (defense no. 13), and laches (defenses no. 14) because CMI seeks equitable relief in its First Amended Complaint, specifically, "an order requiring Defendant to perform its obligations under the Agreement, including, but not limited to, repurchase of defective loans." (Response, p. 20). Allied claims that this Court must deny CMI's motion for summary judgment because CMI argued that its only basis for denying these affirmative defenses was that it was not seeking equitable relief. (Id.).

In reply, CMI contends that it has not moved for summary judgment on its claim for equitable relief; it has only moved for money damages. (Reply, p. 26). CMI asserts that it is not required to seek each and every type of relief sought in the Complaint. (Id.). In addition, CMI contends that, contrary to Allied's claim, it has addressed the substantive deficiencies in Allied's affirmative defenses. (Memorandum, pp. 24-26; Reply, pp. 26-27). First, with respect to unclean hands and in pari delicto, CMI asserts that the undisputed facts do not evidence any tortious or criminal activity or other conduct capable of serving as a basis for either defense. (Memorandum, p. 25; Reply, p. 26). Nor has Allied identified any tortious or criminal activity by CMI. (Reply, p. 26). With respect to its laches defense, CMI argues that the laches defense is unavailable because "'the

doctrine of laches will not bar a suit before expiration of the period set forth in the applicable statute of limitations in the absence of special facts demanding extraordinary relief.'" Lane v. Non-Teacher Sch. Emple. Ret. Sys. of Mo., 174 S.W.3d 626, 640 (Mo. Ct. App. 2005)(quoting State ex rel. Gen. Elec. Co. v. Gaertner, 666 S.W.2d 764, 767 (Mo. banc 1984)); Memorandum, p. 26; Reply, pp. 26-27.  CMI notes that the statute of limitations has not expired, and Allied has not identified any facts that would justify the "extraordinary" relief of allowing a laches defense.  (Memorandum, p. 26; Reply, pp. 26-27).  Moreover, CMI claims that a laches defense is inapplicable because CMI has not delayed bringing suit after Allied failed to repurchase the loans.  (Id.).

The Court finds that Allied has failed to provide evidence to support the affirmative defenses of in pari delicto, unclean hands, and laches.  Allied has not demonstrated that CMI was involved in any tortious or criminal activity that would warrant application of the in pari delicto and unclean hands defenses. Likewise, Allied is not entitled to the laches defense because the statute of limitations has not expired and because there has been no allegation that CMI delayed in filing suit.  Accordingly, the Court finds that these equitable defense are not available to Allied as a matter of law.[5]

**C.      Absolute Defenses to Liability**

Based upon the operation of Section 2(i) of the Correspondent

---

[5]Because the Court addresses the substance of these defenses, the Court need not address CMI's argument that it is not proceeding on its equitable claims and, therefore, the equitable defenses do not apply.

Agreement, Allied argues that it did not breach any of the terms of the Agreement and, therefore, CMI has no valid basis for demanding that Allied repurchase and/or indemnify CMI for the Loans.  That is, Allied claims it originated the Loans with the "utmost" due diligence and is shielded from liability pursuant to Section 2(i).  (Response, pp. 20-28).

This argument, however, is premised upon a reading of Section 2(i) which has already been rejected by this Court. As previously discussed, the cure or repurchase clause of Section 11(ii) allows CMI to demand repurchase at any time if it discovers a borrower's material misrepresentation, "even if Allied complied with Citimortgage's guidelines when originating the loan."  See OCM Bancorp, Inc., 2011 U.S. Dist. LEXIS 45437, at *15-16.  Section 11(ii) does not have any "qualifying language" that CMI can only demand repurchase if it determines that Allied knew of the borrower's misrepresentation. Id.

In addition, Allied asserts that it is not liable to repurchase or indemnify CMI for Loans involving income and/or asset misrepresentations because this information was immaterial to CMI's decision to purchase the Loans.  (Response, pp. 25-26).  Allied notes that all of the Loans were originated pursuant to CMI's Stated Income loan product guidelines, which precluded Allied from verifying income and/or assets.  (Id.).  Given that Allied was forbidden from verifying the borrowers' income and assets, Allied argues that CMI cannot claim that this information was material to its decision to purchase the Loans.  (Id.).

In response, CMI claims that the borrowers' representations of income

-23-

and assets were material, and that Allied has not provided any evidence to
support its claim that these representations were not material to CMI.   (Reply,
pp. 17-19).  CMI states that it would not have asked borrowers their income if it
were not material to CMI's decision to purchase the loan.  (Id., p. 18).  The
borrowers' representations in the Uniform Residential Loan Application were
made subject to criminal and civil penalties for falsehood. (Id.).  CMI, thus,
contends that the borrowers' statements of income on the loan applications were
the means it used to determine the borrowers' incomes for Stated Income Loans.
(Id.).  As noted by CMI "[n]othing in the Agreement required Allied to originate
loans as Stated Income Loans as opposed to originating the loans under a full
documentation program."  (Id.).  Because Allied chose to originate the Loans and
sell them to CMI as Stated Income Loans, "Allied assumed the risk that it would
have to repurchase any Loans that CMI determined had been originated or sold to
it on the basis of a material misrepresentation or misstatements of fact."  (Id.).
As evidence that CMI considered the borrowers' income statements to be
material, CMI notes that Allied placed its broker for the Weston Loan, a Stated
Income Loan, on its "list of suspended brokers" because Allied had discovered
'misrepresentation [sic] in the verification of employment as well as fictitious
bank statements' in connection with the Weston Loan's origination."  (SSUF
Response, ¶71; Reply, p. 19).  There, Allied did not claim that the
misrepresentations or misstatements were not material, but told its broker, "[t]his
incident is serious and should require your immediate attention."  (Reply, p. 19).

The Court agrees with the OCM court's determination that a borrower's "substantially misrepresented income" constitutes "a material misrepresentation as a matter of law." OCM Bancorp, Inc., 2011 U.S. Dist. LEXIS 45437, at *16. "Under Missouri law, 'a misrepresentation is deemed material where it is reasonably calculated to affect the action and conduct of the company in deciding whether or not to accept the risk by issuing its policy covering the risk.'" Id. (quoting Continental Cas. Co. v. Maxwell, 799 S.W.2d 882, 889 (Mo. Ct. App. 1990)). The Court finds that this is an instance where the "the materiality of a misrepresentation is so clear that it should be declared material as a matter of law." Continental Cas. Co., 799 S.W.2d at 889; OCM Bancorp, Inc., 2011 U.S. Dist. LEXIS 45437, at *16-17. As noted by CMI, and which Allied does not dispute, a borrower's income is "perhaps the most important and material factor in determining the ability of the borrower to pay back the loan." (Reply, p. 18). "[A] potential borrower's income affects the decision of whether or not to underwrite a loan to that borrower, and, in turn, affects whether [CMI] will want to invest in that loan in the secondary loan market." OCM Bancorp, 2011 U.S. Dist. LEXIS 45437, at *17. Thus, the Court finds that "a borrower's substantially misrepresented income is a material misrepresentation, and so [CMI's] discovery of a borrower's misrepresented income would entitle it under the parties' agreement to demand that OCM repurchase the loan for containing material misrepresentations." Id.

Allied, 4:10CV1863 at 12-20.

Reunion and CitiMortgage raise the identical arguments in this case which they raised in the Allied matter.  I have thoroughly reviewed the parties' briefs and exhibits.  I completely agree with Judge Ross' conclusion that the defenses raised by Allied, which are identically asserted in the present case by Reunion, are without merit.  I hereby adopt the reasoning and conclusions which Judge Ross made in the Allied case and apply them to the matter before me.  As a result, I find that Reunion has failed to assert a legal ground which prevents CitiMortgage from prevailing on its motion for summary judgment on its breach of contract claim.

CitiMortgage has also filed motions to exclude the opinion Reunion's proposed mortgage banking expert, Donald Coker, and to strike the affidavit of David Thayer, Reunion's president, which were submitted by Reunion.  Reunion offers Coker's opinion to support its position that the Agreement contains an ambiguity.  Coker also opines on how he construes the Agreement and how Reunion has asserted valid affirmative defenses.  None of this testimony is relevant.  Because I have found the Agreement not to be ambiguous, Coker's construction of the Agreement is irrelevant.  To the extent that Coker is offering his view of whether Reunion has established its affirmative defenses, such testimony is beyond the purview of expert testimony and offers impermissible legal conclusions.  Coker also opines on the damages available to CitiMortgage.  However, the calculation of CitiMortgage's damages are clearly defined under the Agreement as the Repurchase Price.  Coker's opinion on this issue is irrelevant.  As a result, I will grant CitiMortgage's motion to exclude Coker's opinion.

Similarly, David Thayer's affidavit asserts that the Agreement contained ambiguities and asserts what he thought Reunion's duties were under the Agreement.  Thayer's opinion that the Agreement contains ambiguities is irrelevant because I have already rejected that position.

-26-

Thayer's understanding of what Reunion's duties were under the Agreement is superfluous because the terms of the Agreement speak for themselves.  Thayer's position that CitiMortgage's demand to repurchase the loans at issue is unfair because Reunion complied with all of CitiMortgage's underwriting requirements misses the central contractual obligation of this case. Under the unambiguous terms of the Agreement, Reunion agreed to repurchase loans which CitiMortgage, in it sole discretion found to be materially defective.  Thayer's interpretation of the Agreement to the contrary is not supported by the terms of the Agreement.  As a result, I will deny CitiMortgage's motion to strike Thayer's affidavit.  Instead, I will give his affidavit the weight it is due.

Accordingly,

**IT IS HEREBY ORDERED that** CitiMortgage, Inc.'s motion for summary judgment [#61] is **GRANTED**.

**IT IS FURTHER ORDERED that** CitiMortgage, Inc.'s motion to exclude the opinions of Donald Coker [#57] is **GRANTED**.

**IT IS FURTHER ORDERED that** CitiMortgage, Inc.'s motion to strike the affidavit of David Thayer [#80] is **DENIED**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2012.